## Plumly et al. v. Hadley et al.

*Municipalities — Philadelphia — Powers—Celebrating historical events—Sesqui-Centennial—Diverting public funds to defray expenses—Appropriation to private corporation—Constitutionality—Act of April 3, 1923—Special legislation—Validating Act of March 2, 1927.*

1. At common law, as well as under the general welfare clause of the Act of March 11, 1789, 2 Sm. Laws, 467, the City of Philadelphia had the right to provide for a suitable celebration of the 150th anniversary of the signing of the Declaration of Independence and to provide money therefor from the public funds.

2. In order to supply the money needed for this municipal function, an increase of indebtedness authorized by the people could be diverted by the voters, on the suggestion of the Council, after that body had in due form declared its original purpose to be impracticable and inadvisable.

3. An appropriation of these funds to a private corporation, known as the Sesqui-Centennial Exhibition Association and organized to take charge of the celebration, was not unconstitutional.

4. The fact that there is only one city in the Commonwealth belonging in the first class does not make the Act of April 3, 1923, P. L. 50, providing for the diversion of funds from one purpose to another, special legislation.

5. The amendment to article iii of the Constitution empowers the legislature to classify cities, etc., and expresssly provides that all laws relating to each class shall be deemed general legislation.

6. Whatever defects there may have been in the proceedings under the Act of 1923, *supra*, were cured by the Act of March 2, 1927 (Act No. 3).

*Statutes—Construction—Curative statute—Retrospective effect.*

7. Where the omission to be cured is some act which the legislature might have dispensed with by a prior statute, the courts will so construe the curative act as to give it the retrospective operation intended.

*Municipal law—Philadelphia—Resolutions distinguished from ordinances.*

8. A resolution cannot take the place of an ordinance; there is an essential difference between the two. Sections 3 and 4 of the Act of May 23, 1874, P. L. 281, prescribe certain formalities for the passage of an ordinance through Councils. Resolutions are distinguished from ordinances, in that they lack these wise and salutary safeguards against ill-considered action under the stress of popular clamor; hence, a resolution of the Council passed April 7, 1927, reciting as its authority the Act of April 6, 1927 (Act No. 94), authorizing the Mayor and Controller to countersign warrants for the payment of certain liabilities incurred by the Sesqui-Centennial Association, is not authorized by the act in question, which directs that the appropriations thereunder shall be by ordinance passed by a two-thirds vote of the Council and approved by the Mayor.

*Municipalities — Philadelphia—Indebtedness—Increase—Purpose—Certification by City Controller—Dispensing with requirement—Rights of creditor—Equal protection—14th Amendment.*

9. The requirement that, before the borrowing by the City of money for any particular purpose, the City Controller shall certify to the Council whether the expenditures thereby provided for are capital expenditures as distinguished from current expenses, may be eliminated by the legislature and may, therefore, be dispensed with by a validating enactment.

10. Paying a creditor of the Sesqui-Centennial Association is not a denial of the equal protection of the law, guaranteed by Amendment 14 of the Constitution of the United States, to a creditor not included as a distributee of the fund set aside for the payment of the debts of the Association.

*Philadelphia—City Controller—Challenging validity of claim.*

11. In the absence of fraud, the City Controller cannot challenge the validity of a claim duly allowed by the Council.

*Mandamus—City Controller—City Treasurer—Refusing to countersign and pay warrants.*

12. A writ of mandamus in the alternative is the proper remedy to compel the City Controller to audit an account which shows the basis of a creditor's claim for the payment of which the Council has made provision, and to countersign the warrant on the City Treasurer, and to compel the latter to pay the warrant.

Plumly et al. v. Hadley et al.

Demurrers to returns by City Controller, City Treasurer and taxpayers to writ of mandamus in alternative form. C. P. No. 4, Phila. Co., March T., 1927, No. 13435.

*F. R. Savidge,* for plaintiffs; *J. J. Regan, Jr.,* for defendants.

AUDENRIED, P. J., FINLETTER and McCULLEN, JJ., July 26, 1927.—The plaintiffs are engaged in business as printers under the trade-name of George F. Lasher Printing Company. They hold a warrant, signed by the Mayor of Philadelphia, directing the payment to them of the sum of $38,340.58 out of certain moneys in the hands of the City Treasurer. This cannot lawfully be paid until it has been approved by the City Controller, and it has not yet been approved by him. On petition of the plaintiffs, a writ of mandamus in the alternative form was issued, requiring the City Controller to examine, audit and settle their account and countersign their warrant, or show cause why he should not do so. It also requires the City Treasurer to pay the warrant when approved by the Controller, or show cause why payment thereof should not be made. A return to the writ has been made by each of the officials mentioned. Returns thereto have also been framed and filed by certain taxpayers of Philadelphia, who, in pursuance of section 9 of the Act of June 8, 1893, P. L. 345, were permitted to do so. To the returns to the writ the plaintiffs have demurred, and the case now comes before the court for decision on the question whether a valid reason has been shown why the City Controller's approval of the warrant should be withheld.

The warrant in question was signed by the Mayor pursuant to an ordinance passed by the Council of the City and approved Dec. 17, 1926. By this the Mayor was authorized to draw, and the City Controller to countersign, warrants against Item 210 Loan in the appropriation to the Department of the Mayor for the payment of certain bills incurred by The Sesqui-Centennial Exhibition Association in the conduct of a public exposition held for the purpose of celebrating the 150th anniversary of the signing of the Declaration of Independence.

The Sesqui-Centennial Exhibition Association is a private corporation formed for the purpose of carrying out more conveniently than the municipality could by its own officials the scheme for appropriately celebrating the great event above referred to. The plan for the celebration by the holding of a world's fair at Philadelphia had been suggested by certain public-spirited and enthusiastic citizens, and the support of the City authorities had been secured as early as Feb. 1, 1922, when the City Council had, by resolution, pledged the honor, faith and credit of Philadelphia "to provide, by loans or otherwise, the necessary and reasonable amounts required to liquidate the cost of building, construction and improvements in, upon and about the grounds to be used in connection with the proposed exposition."

The celebration was held in the summer of the year 1926. Whatever opinion may finally prevail as to its success when regarded from other points of view, there can be no question that, from the financial standpoint, it was a costly and lamentable failure. Not only was there exhausted the entire capital of the corporation formed to carry out the scheme and the liberal aid that it had received in the shape of appropriations from the treasuries of the City, the Commonwealth and the Nation, but the Association had fallen into debt to the extent of approximately $5,500,000, against which it had undisposed-of assets of a doubtful and hardly considerable value.

In this situation the Association, in reliance on the pledge given by the resolution above referred to, reaffirmed by another resolution adopted by

Plumly et al. *v.* Hadley et al.

Council Sept. 4, 1926, presented to the Mayor a schedule of its liabilities, which was by him laid before Council. The response by that body to this appeal was the passage of the ordinance approved by the Mayor Dec. 17, 1926. See appendix to the Journal of Council, 1926, page 712.

By this ordinance payment of bills in favor of specified persons to the aggregate amount of $4,859,773.74 was directed to be made. The name of the plaintiffs' firm was included in this list.

Subsequently, on April 7, 1927, City Council, by resolution, reciting as its authority an act of assembly passed on the previous day, again endeavored to authorize the Mayor to draw and the Controller to countersign warrants for the payments provided for by the ordinance above mentioned.

The question of the effect of the resolution last referred to may be disposed of in a few words by pointing out that the statute therein cited, entitled "An act authorizing cities of the first class to appropriate money to pay for work previously done, material previously furnished and services previously rendered, in connection with any public exposition celebrating the Sesqui-Centennial Anniversary of the Declaration of Independence, up to five million dollars ($5,000,000)," approved April 6, 1927 (Act No. 94), requires the appropriations that it provides for to be made by ordinance passed by a two-thirds vote of all the members elected to the City Council and approved by the Mayor. No information as to the vote upon the resolution in question is forthcoming, but, whatever was the vote upon it, a mere resolution cannot take the place of an ordinance. Sections 3 and 4 of the Act of May 23, 1874, P. L. 231, provide that no ordinance may be passed through council except by bill which has been referred to a committee, returned therefrom, printed for the use of the members before the final vote is taken thereon, and voted for by a majority of the members elected, on a call of the yeas and nays, and no bill can become a law upon the same day on which it is introduced or reported. Resolutions are distinguished from ordinances in that they lack these wise and salutary safeguards against ill-considered action under the stress of popular clamor. Plainly the resolution of April 7, 1927, was ineffective as an exercise of the power bestowed on Council by the Act of April 6, 1927, and in no wise improved the rights of the plaintiffs.

The great question, then, relates to the effect of the Ordinance of Dec. 17, 1926. This is raised by both the defendants and both the intervenors on three grounds. The first of these is the alleged lack of power in the municipality to expend the public money in celebrating such an event as the Sesqui-Centennial Anniversary of the signing of the Declaration of American Independence; the second is the supposed illegality of using public money to assist or make good the debts incurred by the private corporation to which the municipal authorities had committed the preparation and management of the exposition, which was the form of celebration determined upon; and the third is the supposed fact that the fund from which the payments are directed to be made is money raised by a loan authorized by the voters for another purpose, and, therefore, unavailable for the purpose to which it is now sought to be applied.

So far as concerns the first of these objections, nothing more need be said than was pointed out by the Supreme Court of Pennsylvania in the case of Stegmaier *v.* Goeringer, 218 Pa. 499 (1907), where, speaking by Elkin, J., it said: "The custom of commemorating important historical, military and civil events is as old as mankind, and at common law the right of municipalities to make appropriations out of the public funds for the proper observance of such occasions was recognized for centuries. There is no reason why a municipal-

ity, unless restricted by statute, should not be permitted to make reasonable appropriations in order to fitly commemorate public events in which all the citizens thereof are, or should be, interested." "How," exclaimed Senator Edward Everett, "is the spirit of a free people to be formed and animated and cheered but out of the storehouse of its historic recollections!" Under section 16 of the Act of March 11, 1789, 2 Sm. Laws, 467, the Council of Philadelphia might "make, ordain, constitute and establish such and so many laws, ordinances, regulations and constitutions *(provided the same shall not be repugnant to the laws and Constitution of this Commonwealth)* as shall be necessary or convenient for the government and welfare of the said city." The right of cities of the first class to participate in such celebrations as that with which we are here concerned was recognized by the legislature in the amendment of July 11, 1923, P. L. 1037, to section 8 of article XVII of the Act of June 25, 1919, P. L. 581 (which provides for the government of cities of the first class), by specifically authorizing the borrowing of money or the incurrence of debt for any public exposition celebrating the Sesqui-Centennial Anniversary. Whether or not that act can be seriously questioned as special legislation (and we may observe, in passing, that, in our opinion, such an objection to it could not be successfully maintained) is quite unimportant. Under the decision in the case above cited, whether it be considered as inherent at common law in every municipality or as vested in Philadelphia by the general welfare clause in the Act of 1789, *supra,* the power of the Council to provide at the public expense for suitable ceremonies to celebrate the greatest of all the events in the history of the City and Nation is indubitable.

By section 7 of article IX of the Constitution it is provided: "The general assembly shall not authorize any county, city, borough, township or incorporated district . . . to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." Under this clause it is the general rule that public moneys appropriated for expenditure in any enterprise in which the general welfare of the inhabitants of a municipality is involved should be expended only by the proper officials of the municipal government, and that the bills or vouchers for the work, etc., should be presented, audited and paid in the regular way. In Com. ex rel. *v.* Pittsburgh, 183 Pa. 209, however, it was held by the Supreme Court that a city might appropriate money to a committee of private citizens to be used for a purpose intended to promote the general good of the people. The reasoning by which that result was reached is not particularly satisfying, and the decision seems to be based largely on the insignificance of the sum appropriated as compared with the vast interests involved in the matter, but it has since been recognized  . as authoritatively settling the law to the effect that a city may, under certain circumstances and for proper purposes, appropriate money to an organization of private persons acting for the general welfare of the inhabitants of the municipality: Stegmaier *v.* Goeringer, 218 Pa. 499 (1907). It was there pointed out that this is an extreme exercise of municipal power "which should be carefully guarded." In passing on objections made by taxpayers to an appropriation by the City of Philadelphia to a private association formed to make provision for the raising of funds to distribute in pensions to infirm or aged members of its police force or to their widows and orphans, it had already been said by that court: "There is no merit in the objection that councils delegated the distribution of the sum appropriated to the 'Philadelphia Police Pension Fund Association' instead of distributing it themselves. If they were satisfied, as they doubtless were, that the distribution of the fund would be better effected through the agency of the Association than by

an agency of their own creation, they had a right to so provide." See Com. v. Walton, 182 Pa. 373.

In this connection, it may be observed that section 20 of article III of the Constitution is without bearing on the question before the court. By that clause the general assembly is forbidden to delegate to any special commission, private corporation or association any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever. The purpose of this prohibition was obviously to prevent the entrusting of governmental powers to any hands other than those of municipal or quasi-municipal corporations whose officials are, directly or indirectly, amenable to control by the vote of their constituents. The Sesqui-Centennial Exhibition Association was not vested with any such powers. It does not possess the right of eminent domain. It could not levy taxes. It usurped no prerogative of the City authorities. Nor does the provision of section 2 of article xv of the Constitution, that no debt shall be contracted or liability incurred by any municipal commission, except in pursuance of an appropriation previously made therefor by the municipal government, bear upon the question of the right of Council, in fulfillment of a species of moral obligation, to make good to the creditors of a private corporation formed to carry on a great public enterprise of undoubted benefit to the entire community the liabilities that it had incurred to them in doing what legal technicalities made it impossible for the city itself to accomplish without the greatest inconvenience, cost and delay.

The third objection to the Ordinance of Dec. 17, 1926, involves the question of the validity of the transfer of the right to borrow granted by the voters of the City for a certain purpose to the purpose of financing the Sesqui-Centennial Celebration, and, incidentally, the question of the validity of the $5,000,000 loan that the City authorities have negotiated under that authorization.

It will be observed that the ordinance provides that the warrants thereby authorized are to be drawn against what is referred to as "Item 210 Loan." That item consists of the sum of $5,000,000 appropriated by City Council to the Department of the Mayor "for the payment of bills incurred in connection with the public exposition celebrating the Sesqui-Centennial, for permanent or temporary purposes, but only directly in connection with that exposition." The money thus appropriated had been raised through the sale, under authority of a duly enacted ordinance, of the City's bonds or certificates of loan. The power to increase the debt of the City by the sum of $7,500,000 had been granted to Councils by the electors on May 16, 1916, for sundry purposes unnecessary to set forth, which, on Sept. 18, 1923, were changed by the electors so that the money to be raised by the proposed increase of the City's indebtedness was to be applied to the construction and equipment of a certain subway and elevated railway. By an ordinance approved by the Mayor Oct. 1, 1926, the Council declared that the construction of the proposed railway was impracticable and inadvisable, and ordained that, subject to the assent of the electors, given at a public election to be held Nov. 2, 1926, of the money theretofore authorized to be borrowed, the sum of $2,500,000 should be used for the construction of a bridge over Wissahickon Creek and the sum of $5,000,000 should be used for the public exposition celebrating the Sesqui-Centennial Anniversary then being held, "which debt might be incurred for permanent or temporary purposes, but only directly in connection with the celebration of the Sesqui-Centennial Anniversary, and for no other pur-

pose." That ordinance made provision for the holding of the election on the proposed change of purpose of the loan; also for compliance with the formalities required by the statute providing for the transfer of the power to borrow money for one purpose to another when its original purpose had failed.

The statute just mentioned is the Act of April 3, 1923, P. L. 50. Its 1st and 3rd sections read as follows:

"Section 1. Whenever any city of the first class has increased or has authorized the increase of its indebtedness with or without the assent of the electors of such city, or shall hereafter so increase or authorize the increase of its indebtedness, and the purpose of such increase or authorized increase has proved or shall prove to be impracticable, impossible or inadvisable, the council of such city may by their ordinance, which shall require the affirmative vote of two-thirds of all the members of the council, so declare, and (a) may provide for the use of the money so borrowed or authorized to be borrowed for any other municipal purpose for which such indebtedness could have originally been lawfully incurred and upon the certificate of the city controller, as required by law for the original incurring of such debt, or (b) may rescind the authority to borrow such money."

"Section 3. Whenever the original increase of indebtedness shall have been made or authorized with the assent of the electors of such city, and the council may desire to use the money so borrowed, or authorized to be borrowed, for any other lawful municipal purpose as aforesaid, or to refrain from borrowing so much thereof as shall not have been borrowed, or any part thereof, they shall give notice by advertisement once a week for four weeks in each of three daily newspapers having a bona fide circulation in such city of at least thirty thousand (30,000) copies per issue, of an election to be held at the place or places of holding municipal elections on a day to be by them fixed.  Such notice shall state: (a) The date of such election; (b) the amount of money theretofore borrowed, or authorized to be borrowed, for the purpose in question; (c) the purpose for which such indebtedness was originally authorized; (d) the new purpose for which the council of such city desire to make use of said money, or the fact that it is desired not to borrow the same or a specified amount thereof, and such notice may further state: (e) the reason why said money may not be used for the purpose for which it was borrowed or authorized to be borrowed, or why it may be advisable not to use it for such purpose.

"A certified copy of the ordinance required by section 1 of this act, and, where notice shall be required by section 3 hereof, a copy of such notice shall be filed in the office of the prothonotary of the Court of Common Pleas of the county in which such city is situated."

On Nov. 2, 1926, an election was held at which the question of assenting to the proposed change of purpose for which the $7,500,000 loan had in 1916 been authorized by Council was submitted to the electors of Philadelphia. The change was consented to by the great majority of those who voted.

The validity of the loan negotiated by the City authorities under these proceedings is now called into question. If that is lacking in legal authorization, it is obvious that the money so raised should not be paid out as authorized by the ordinance under consideration, but should be held for return to those by whom it was paid to the City Treasurer.

The loan is questioned on three grounds. It is suggested, in the first place, that by section 1 of the Act of April 3, 1923, it is provided that the change of the use to be made of money borrowed or authorized to be borrowed may be

made only to some other municipal purpose for which such indebtedness could have originally been lawfully incurred. Secondly, it is urged that the act referred to is special legislation, and, therefore, unconstitutional. Third, it is pointed out that a certain certificate of the City Controller required by the act was not filed. These objections may, we think, be disposed of as follows:

1. It is clear, without reference to the Act of July 11, 1923, P. L. 1037, above mentioned (whose constitutionality is questioned), that at common law, as well as under the Act of March 11, 1789, 2 Sm. Laws, 467, the City of Philadelphia had, on May 16, 1916, the right to provide for a proper celebration of the 150th anniversary of the signing of the Declaration of Independence: Stegmaier *v.* Goeringer, 218 Pa. 499. For that purpose, therefore, the increase of indebtedness authorized at that time by the people could have been lawfully incurred, and to that purpose, accordingly, the loan could be diverted by the voters, on the suggestion of Council, after that body had in due form declared its original purpose to be impracticable and inadvisable.

2. The act under consideration relates to all cities of the first class. By the Act of June 25, 1895, P. L. 275, the general assembly enacted that cities containing a population of 1,000,000 or over, as ascertained by the last preceding United States census, shall constitute the first class of cities. While at present there is but one city in the Commonwealth belonging to the first class thus defined, it is quite probable that another will soon be advanced to it. That in 1923 there was but one city affected by this enactment is no reason to denounce it as special legislation. The financial necessities of vast aggregations of people differentiate them not only in degree but in kind from smaller communities, and that obvious difference constitutes a proper basis for classification.

3. Whatever defects there may have been in the proceedings under the Act of April 3, 1923, P. L. 50, were cured by the Act of March 2, 1927 (Act No. 3). This statute validates, ratifies and confirms all bonds, certificates of indebtedness, securities and obligations issued or to be issued by any city of the first class for money borrowed for any public exposition celebrating the Sesqui-Centennial Anniversary, etc., and the debt of such cities so incurred pursuant to certain notices given, ordinances passed, certificates delivered, proceedings and elections of such cities had and held in accordance with the provisions of the act first above mentioned. The charge of being special legislation cannot be sustained so far as concerns the act just cited. By the amendment to article III of the Constitution, the legislature is empowered to classify counties, cities, boroughs, school districts and townships according to population; and it is thereby provided that all laws passed relating to each class shall be deemed general legislation within the meaning of the Constitution. Under this amendment it was not essential that a new classification of cities should be made. The legislature could undoubtedly act under its previous classification thereof. Where the omission to be cured is some act which the legislature might have dispensed with by a prior statute, the courts will so construe the curative act as to give it the retrospective operation intended: Swartz *v.* Carlisle Borough, 237 Pa. 473. However important and desirable it may be that, before the borrowing by the City of money for any particular purpose, the Controller should certify to the Council whether the expenditures thereby provided for are capital expenditures as distinguished from current expenses, this provision of the law might at any time be eliminated by the legislature, and, therefore, be dispensed with by a validating enactment.

We are of the opinion that the borrowing by the City, under the proceedings above outlined, of $5,000,000 for use in connection with the Sesqui-Cen-

tennial Exposition was lawful; that the bonds of the City for that sum will, when properly executed, be valid obligations binding upon the municipality; and that the money that came into the City Treasury as the proceeds of that loan is legally available for appropriation under the Ordinance of Dec. 12, 1926.

With respect to the suggestion advanced in the return filed by Jacob Marcus, intervening taxpayer, who claims to be a creditor of the Sesqui-Centennial Association, that the ordinance is invalid because, in violation of the 14th Amendment of the Constitution of the United States, it denies him and other creditors of the Association the equal protection of law to which they are entitled, we can only repeat what we have heretofore held on this point. Neither the vote of the electors of Philadelphia at the election of Nov. 2, 1926, nor the ordinances passed in pursuance thereof, nor the enactments of the general assembly authorizing them, served to impress on any of the City's funds a trust in favor of the Sesqui-Centennial Exhibition Association, or of those to whom it is indebted. These measures served merely to invest the City Council and the Mayor with the power to expend the sum of $5,000,000 in their discretion, subject only to the limitation that its disbursement shall be confined to matters connected with the Sesqui-Centennial Exhibition. Whatever the City authorities see fit to distribute among the creditors of the Association is entirely *ex gratia*. While one cannot lawfully prefer certain of his own creditors over others, he may, in general, if solvent, do what he pleases with his own property. In a purely voluntary distribution, no one may of right claim to participate. Equality before the law is not denied him if he is not included as a distributee.

No money may be drawn from the City Treasury except by due process of law, or upon warrants or checks signed by the head of the appropriate department, or his duly authorized deputy, or by such other person as may be designated by ordinance, and countersigned by the Controller. The City Treasurer should pay all warrants or checks duly issued and countersigned. If the City Controller shall approve any warrant which should not be approved, he and his sureties become individually liable for the amount of the same to the holder thereof. Whenever a warrant on the Treasurer is presented to the Controller, he has power to require evidence that the amount claimed is justly due. It is his duty to audit all accounts in which the City is concerned. See Act of June 25, 1919, P. L. 581. His "duties are partly ministerial and partly discretionary, and while the courts will not review his discretion exercised in a proper case, yet he is not above the law and his discretion is not arbitrary, but legal. When, therefore, he is called upon by the courts, the facts must be made to appear sufficiently to show that they bring the case within his discretion and that it was exercised in obedience to law:" per Mitchell, J., in Com. *v.* Walton, 176 Pa. 588. In the return of the Controller, no fact is pleaded that justifies his failure to audit the plaintiffs' account. The Ordinance of Dec. 17, 1926, made that account one in which the City is concerned. The matters of law suggested by his return afford no valid basis for his refusal to countersign the plaintiffs' warrant. "The Council," it was said by the Supreme Court in the recently decided case of Com. *v.* Tice, 272 Pa. 447, "is the governing body of the city, and, in the absence of fraud, which is not here alleged, the Controller cannot challenge the validity of a. claim duly allowed by that body; otherwise, he would be above the Council, and could in effect veto their acts." It is to be remembered, however, that it was laid down by the same court, in Stegmaier *v.* Goeringer, 218 Pa. 499, where the facts were very analogous to those involved in the present case, that in such cases "bills should

be presented, vouchers filed and the accounts audited in the same manner as is provided by law for the expenditure of other public funds."

The plaintiffs have no other means of enforcing their claim against the City under the ordinance directing the payment of the money appropriated to them than that to which they have resorted. We think, therefore, that the present proceeding is appropriate. While it is true that the City Treasurer is under no duty to pay them money until the countersignature of the Controller on their warrant has been obtained, the joinder of these two officials is supported by ample precedent. See Com. *v.* Powell, 249 Pa. 144.

The court is of the opinion that the demurrer in the case of each of the returns should be sustained and that the plaintiffs are entitled to have issued a peremptory mandamus requiring WillB. Hadley, Controller of the City of Philadelphia, to audit forthwith the account of the plaintiffs showing the basis of their claim against the Sesqui-Centennial Exhibition Association, for the payment of the amount of which in the sum of $38,340.58 Council has made provision, and to countersign the warrant on the City Treasurer for the same, if shown to be just and *bona fide;* also requiring the City Treasurer of Philadelphia, Harry A. Mackey, to pay that warrant when countersigned by the Controller. Such a writ is now awarded to the plaintiffs, and it is considered and adjudged that the plaintiffs recover from the defendants their costs in this behalf expended or incurred.